UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LORI BRISBOIS, | Case No. 15-CV-0570 (PJS/TNL) |
| Plaintiff, | |
| v. | ORDER |
| SOO LINE RAILROAD COMPANY d/b/a CANADIAN PACIFIC, | |
| Defendant. | |

James H. Kaster, Matthew H. Morgan, and Nicholas D. Thompson, NICHOLS KASTER, PLLP, for plaintiff.

Tracey Holmes Donesky and Matthew Tews, STINSON LEONARD STREET LLP, for defendant.

Plaintiff Lori Brisbois is a long-time employee of defendant Soo Line Railroad Company d/b/a Canadian Pacific (the "Railroad"). In 2012, the Railroad suspended Brisbois for five days without pay and restricted her seniority for one year. Brisbois contends that she was disciplined in retaliation for reporting a safety concern, and thus that the Railroad violated the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. The Railroad contends that Bribois was disciplined because she was argumentative and repeatedly defied the instructions of her supervisor.

This matter is before the Court on the Railroad's motion for summary judgment. Because the evidence is clear that Brisbois was not disciplined for reporting a safety concern, the Railroad's motion is granted, and Brisbois's claim is dismissed.[1]

## I.  BACKGROUND

Brisbois was hired by the Railroad in 2006.  Brisbois Dep. [ECF No. 59-2] at 56, 149.  Since then, she has worked as a track laborer, track inspector, machine operator, assistant foreman, and foreman.  *Id.* at 89, 91, 94-95, 71-102, 130.  Brisbois has often brought safety concerns to the Railroad's attention.  *Id.* at 231-32.  She has never suffered any adverse consequence on account of raising those safety concerns; indeed, her supervisors rewarded her by offering to allow her to leave work early after she reported that another foreman had asked a machine operator to release a train without giving him the "slow order information that he needed."  *Id.* at 232-33.

Brisbois's supervisors have, however, occasionally complained about her work. *Id.* at 166-69.  Sometimes they have accused her of being late with her job briefings.  *Id.* at 167.  Other times they have said that she was "not doing enough." *Id.* at 166-68.  And in May 2012, Brisbois was issued a formal "positive action plan" for being "argumenta[tive]" and "insubordinate" and for "fail[ing] to comply with [her]

---

[1] Brisbois initially brought eight claims against the Railroad.  The Court previously dismissed seven of those eight claims—some on motion of the Railroad, and others on stipulation of the parties.  *See* ECF Nos. 32 and 41.  This order disposes of the remaining claim.

supervisors['] instructions."  *Id.* at 170-72; Donesky Decl. Ex. M [ECF No. 59-13], at 1.  Brisbois disputes the legitimacy of these complaints, but she does not deny that the complaints were made.  *See* Brisbois Dep. 166-71, 180-82.

On July 12, 2012, Brisbois was working as a foreman at a rail yard in St. Paul, Minnesota.  *Id.* at 25-27.  Her crew was scheduled to work on tracks 37 and 38, both of which were "protected"—meaning that the tracks were configured to prevent trains from coming onto them.  *Id.* at 11-12, 189-90.  The adjacent tracks (tracks 36 and 39) were, however, initially unprotected.[2]  *Id.* at 32-36, 251-53.  When Brisbois briefed her crew, she reminded them not to "foul" any unprotected tracks.[3]  Donesky Decl. Ex. G [ECF No. 59-7], at 114; Donesky Decl. Ex. P [ECF No. 59-16], at 12.  Specifically, she warned the crew members not to walk down or cross any unprotected tracks while carrying equipment or supplies.  Brisbois Dep. 52-53, 219.  Brisbois then left to lock out the west end of track 39.  Donesky Decl. Ex. G, at 127-28.

After Brisbois reached the west end of track 39, she noticed that part of her crew was walking down track 39, "carrying water, ice, tools, supplies, parts, clothing, lunchboxes," and other equipment.  Brisbois Dep. 10, 13, 200, 219; *see also* Donesky Decl.

---

[2] To be precise, Brisbois had only locked down one end of these tracks, so trains could still come onto these tracks from the other end.  Brisbois Dep. 32-36, 251-53.

[3] Eugene Mashak, another Railroad employee, defined "fouling" a track as coming within four feet of the rails.  Mashak Dep. [ECF No. 59-25] at 17-19.

Ex. G, at 127-28; Donesky Decl. Ex. P, at 12.  Brisbois also saw a new employee, Dominic Lamana, wandering around on unprotected track 40.[4]  Brisbois Dep. 16-18.  Brisbois immediately stopped some of her crew members from "proceeding over the track."  *Id.* at 10, 199.  Other crew members were too far away for her to stop, *id.*, so she did the next best thing by quickly finishing the locking out of track 39.  *Id.* at 48, 201.  Brisbois then drove back to her crew and asked them why they had crossed track 39 without her permission.  *Id.* at 205.  The workers responded that Brisbois's boss, Kenneth Heath, had "told them to go to work."  *Id.* at 37, 161, 165, 207.

Heath showed up a few minutes later, and Brisbois went to confront him.  *Id.* at 207-09.  At this point, Brisbois's crew members were no longer in danger, as all of them were working safely on protected tracks.  *Id.* at 221-22.  But Brisbois nevertheless wanted to talk to Heath about how he had "improperly permitted [her crew] to enter into tracks that had not been protected."  *Id.* at 296.  To that end, she asked Heath—and continued to ask Heath—whether he thought what he had done was a "safety" concern.  *Id.* at 210-13.  Heath evaded the question.  Heath denied ordering Brisbois's "whole"

---

[4] There is some dispute over Lamana's exact location.  *Compare* Donesky Decl. Ex. G, at 15, 32, 37 (alternately suggesting that Lamana was on track 39 or 40), *with* Brisbois Dep. 219-21, 259 (stating that Lamana was on track 40).  And Lamana himself does not recall straying onto an unprotected track.  Brisbois Dep. 264-65.  At the summary judgment stage, though, the Court must draw all reasonable factual inferences in favor of Brisbois, so the Court will assume that Lamana was walking on an unprotected track as Brisbois claimed.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

crew to go to work. *Id.* at 210.  Heath asked Brisbois whether she had properly locked out tracks 37 and 38 the previous night. *Id.* at 213, 226.  And Heath told Brisbois that she should have talked directly to Lamana if she was concerned for his safety. *Id.* at 222.  The conversation continued like this for a while.

Finally, Heath told Brisbois to stop arguing and go back to work. *Id.* at 214. Brisbois did not stop arguing and did not go back to work. *Id.* at 244-45.  According to Brisbois, Heath did not tell her to stop *talking*, but to stop *arguing*. *Id.*  Also according to Brisbois, she was not "arguing," but merely "asking for clarification." *Id.* at 228.  Thus, Brisbois contends, it was *impossible* for her to follow Heath's instruction, because she could not stop doing something that she was not doing in the first place. *Id.* at 245-46. (Brisbois does not explain why she could not follow Heath's instruction to go back to work.)

Needless to say, Heath did not see things the same way.  Two more times, Heath told Brisbois to stop arguing and warned her that, if she did not stop arguing and get back to work, he would send her home. *Id.* at 226-28, 245-47, 260-62.  And two more times, Brisbois persisted in asking Heath whether he thought what he had ordered the crew to do was a safety concern. *Id.*  After the third such exchange, Heath sent Brisbois home. *Id.* at 37.  It was roughly 7:00 a.m. *Id.* at 38-39.

One month later, the Railroad conducted a disciplinary hearing. *Id.* at 185. After taking testimony from Brisbois, Heath, and several other employees, the Railroad determined that Brisbois had violated Rules 1.6 and 1.13 of the General Code of Operating Rules. *See* Donesky Decl. Ex. BB [ECF No. 59-29]. Rule 1.6 prohibits employees from being "insubordinate," "quarrelsome," or "discourteous." Donesky Decl. Ex. H [ECF No. 59-8], at 15. And Rule 1.13 generally requires employees to follow their supervisors' instructions. Brisbois Dep. 159-62. As punishment for these rule violations, Brisbois was suspended for five days without pay and her seniority was restricted for one year. *Id.* at 5-6, 271-72; Donesky Decl. Ex. BB. This lawsuit followed.

## II. STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

III.  ANALYSIS

The FRSA prohibits any rail carrier from "demot[ing], suspend[ing], [or] reprimand[ing] . . . an employee for . . . reporting, in good faith, a hazardous safety or security condition."  49 U.S.C. § 20109(b)(1)(A).  To establish a prima facie case of retaliation under the FRSA, Brisbois must show that (1) she engaged in protected activity; (2) the Railroad "knew or suspected" that she engaged in this activity; (3) she later suffered an adverse employment action; and (4) "the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014).  If Brisbois establishes a prima facie case, the burden shifts to the Railroad to prove, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of [Brisbois'] protected activity."  *Id.* (internal brackets omitted) (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

*A.  Prima Facie Case*

Brisbois has established the first three elements of her claim:  (1) Brisbois engaged in protected activity when she objected to Heath giving permission to members of her crew to foul an unprotected track; (2) the Railroad knew that Brisbois had engaged in this protected activity when the Railroad disciplined her; and (3) Brisbois suffered an adverse employment action when the Railroad suspended her

for five days without pay. But Brisbois has not established the fourth element of her claim, as the evidence in the record does not give rise to a reasonable inference "that the protected activity was a contributing factor in the adverse action." *Id.*

### 1. Brisbois's Protected Activity

As noted, the FRSA forbids a rail carrier to retaliate against an employee who "report[s], in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). Here, Brisbois engaged in protected activity when she objected to Heath giving her crew permission to foul an unprotected track. Brisbois lodged this complaint only after seeing several members of her crew walk down an unprotected track, an activity that was "hazardous." After witnessing this safety violation, Brisbois locked down track 39 as soon as possible for her crew's "protection," and Brisbois repeatedly used the word "safety" in her conversation with Heath.[5] Brisbois Dep. 15, 210-11. Two employees of the railroad later agreed that Brisbois had raised a "safety concern" with Heath. *See* Mashak Dep. 26-27; Meyer Dep. [ECF No. 59-28] at 57-58; *cf.* Cartlidge Dep. [ECF No. 59-26] at 31.

The Railroad argues, however, that even though Brisbois raised a safety concern, she did not engage in activity protected by the FRSA because she was "simply doing

---

[5] The Railroad points out that Brisbois did not use the words "good faith challenge" when she objected to Heath's actions. Def.'s Mem. Supp. M. Summ. J. [ECF No. 57] at 5-6, 15. That is true but irrelevant. The FRSA does not require employees to use any magic words in making a safety report.

her job by reporting alleged safety concerns." Def.'s Mem. 21.  According to the Railroad, the FRSA does not protect an employee from being fired for raising a safety concern if the duties of her position include reporting safety concerns.  *Id.* at 21-23.

This purported "job-duties exception" is not the law in the Eighth Circuit—nor should it be—for several reasons:

First, the text of the FRSA does not include a job-duties exception.  As a general matter, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  *Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) (quoting *Glover v. Constr. Co.*, 446 U.S. 608, 616-17 (1980)).  When drafting the FRSA, Congress included several explicit exceptions to the Act's mandates, but a job-duties exception was not one of them.  *See, e.g.*, 49 U.S.C. § 20109(b)(2)(C), (c)(2).  The Court will not read into the FRSA an exception that Congress declined to include.

Second, the Eighth Circuit has never read a job-duties exception into the FRSA.  In fact, the Court is not aware of any case from any jurisdiction that has interpreted the FRSA to include a job-duties exception.  *Cf.* Def.'s Mem. 21-23 (citing only First Amendment, Title VII, FLSA, Whistleblower Protection Act, Missouri Human Rights Act, and Minnesota Human Rights Act cases in support of its "job duties" argument).

Third, a broad job-duties exception would undermine Congress's intent to promote safety by protecting whistleblowers from retaliation. A job-duties exception would allow a rail carrier to exclude *all* of its employees from the FRSA's protections by simply making it *every* employee's duty to report safety concerns. In fact, that is exactly what the Railroad did here: The Railroad required all of its employees to "report any condition or practice that may threaten the safety of trains, passengers, or employees." Donesky Decl. Ex. H, at 14. Surely, Congress did not intend to exclude every one of the Railroad's employees from the protections of the FRSA, just because the Railroad instructed all of those employees to report safety concerns. In sum, the job-duties exception finds no support in the FRSA's text, case law, or public policy, and thus the Court will not read such an exception into the FRSA.

The Railroad also argues that Brisbois's retaliation claim must fail because her safety complaint was not objectively reasonable. The Court disagrees. By all accounts—including the accounts of the Railroad's own witnesses—walking down an unprotected track is a dangerous activity that can result in serious bodily injury or even death. *See, e.g.*, Mashak Dep. 15, 17-18. The Court does not doubt that Brisbois engaged in protected activity when she confronted Heath about permitting her crew to foul an unprotected track.

### 2. The Railroad's Knowledge of Brisbois's Protected Activity

The Railroad knew about Brisbois's protected activity when it disciplined her. *Kuduk*, 768 F.3d at 789. Justin Meyer, the Railroad's regional general manager, read and highlighted portions of the transcript of Brisbois's disciplinary hearing—including the part where Brisbois testified that she had "safety concerns" about her crew—before he decided to suspend her. *See* Meyer Dep. 39-42; Donesky Decl. Ex. S [ECF No. 59-20], at 104-05. And Meyer ultimately determined that Brisbois's conversation with Heath "was regarding safety concerns." Meyer Dep. 58.

### 3. Adverse Employment Action

Brisbois indisputably suffered an "adverse action." *Kuduk*, 768 F.3d at 789. She was suspended without pay for five days and had her seniority restricted for one year.

### 4. Antagonism or Hostility Toward Protected Activity

Brisbois must establish that her protected activity was a "contributing factor" to the Railroad's decision to suspend her. *Id.* This requires Brisbois to do more than point out that she was suspended soon after engaging in protected activity. *Id.* at 792. In other words, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Id.* at 792 (quoting *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009)). Instead, Brisbois must show that, in deciding to

suspend her, the Railroad was motivated at least in part by "discriminatory animus" toward her safety complaint. *Id.* at 791. Stated differently, Brisbois must prove that the Railroad "intentional[ly] retaliat[ed]" against her for making a safety complaint. *Id.*

Brisbois spends seven pages of her brief arguing that *Kuduk* does not really require her to prove "discriminatory animus." *See* Pl.'s Resp. to Def's Mot. Summ. J. [ECF No. 61] at 22-29. She suggests that she only needs to show that her protected activity was a "necessary link in a chain of events" leading to her suspension—that is, a "but for" cause of her suspension. *Id.* at 24 (quoting *Hutton*, ARB No. 11-091, 2013 WL 2450037, at *5 (DOL Admin. Rev. Bd. May 31, 2013)). But *Kuduk* clearly holds otherwise. *Kuduk* specifically rejected the plaintiff's argument that he should not have to "demonstrate the existence of a retaliatory motive" on the part of his employer. *Kuduk*, 768 F.3d at 790-91. And *Kuduk* specifically held that "the contributing factor that an employee must prove is intentional retaliation prompted by the employee engaging in protected activity." *Id.* at 791.[6]

There is a reason why Brisbois went to such lengths to argue that she need not show that, in suspending her, the Railroad was motivated at least in part by animus

---

[6] The Seventh Circuit also recently reversed one of the district court decisions that Brisbois cited in her brief. *See Koziara v. BNSF Ry. Co.*, No. 16-1577, 2016 WL 6407246 (7th Cir. Oct. 31, 2016) (Posner, J.). According to the Seventh Circuit, it is not sufficient for an FRSA plaintiff to show that his protected activity "*initiated* the events that led to his discipline." *Id.* at *4. The plaintiff must prove that his discipline was "retaliatory" or otherwise "motivated by animus." *Id.*

toward her protected activity:  The evidence in the record is overwhelming that Brisbois was not disciplined because she complained about safety, but solely because she was argumentative and defied her supervisor's instructions.  Consider the following:

First, just two months before Brisbois and Heath argued and Brisbois defied his instructions, Brisbois was formally disciplined for being argumentative and for defying her supervisor's instructions.  Specifically, in May 2012 Brisbois received a "positive action plan" for being "argumental [sic]" and "insubordinate" and "fail[ing] to comply with [her] supervisors['] instructions."  Thus, long before Brisbois engaged in protected activity on July 12, 2012, the Railroad had expressed concerns about her being quarrelsome and refusing to obey supervisors.

Second, Brisbois had reported many other safety violations to the Railroad, and yet the Railroad never took adverse action against her for these reports; indeed, on one occasion the Railroad offered to *reward* Brisbois for complaining of a safety violation.  What was different on July 12 is that she was argumentative and defied her supervisor when he told her to stop arguing and return to work.

Third, the record amply supports the Railroad's stated reason for suspending Brisbois.  By her own admission, Brisbois continued pressing her case with Heath even after he told her to stop arguing and get back to work—not once, not twice, but three times.  Brisbois was simply unwilling to drop the matter until Heath cried "uncle" and

admitted that she was right and he was wrong.  Brisbois's insubordination was a violation of two company rules.  It was also unprotected by the FRSA.

To be clear:  Brisbois had every right to report unsafe conduct that could endanger her crew.  49 U.S.C. § 20109(b)(1)(A).  She also had every right to refuse to put herself in a situation that might "present[] an imminent danger of death or serious injury."  *Id.* § 20109(b)(1)(B), (2)(B)(i).  But once Brisbois confirmed that her crew was safe, she did not have the right to refuse to go back to work.  Nor did she have a right to continue to argue with her boss until he admitted that she was right and he was wrong.

Fourth, the safety complaint that Brisbois made is not the type of complaint that would be expected to inspire retaliation.  Brisbois's whistleblowing did not expose the Railroad to legal liability, or require the Railroad to spend a lot of time and money remedying a problem, or put the Railroad at a competitive disadvantage, or implicate anyone in a crime.  As safety complaints go, Brisbois's was small potatoes:  She was complaining that Heath had allowed workers to walk on an unprotected track.  The remedy was to tell the workers to stay off of the unprotected track.  It makes no sense that the Railroad would not retaliate against Brisbois for any of her prior safety reports, but single out this (relatively) minor report for retaliation.

Finally, when Brisbois's attorney was pressed to explain why the Railroad would retaliate against Brisbois in light of these circumstances, he responded that Heath was a

"thin-skinned supervisor who apparently wanted to demonstrate that he was in charge." ECF No. 67 at 35. This assessment of the situation is certainly supported by the record, but the FRSA is not violated when a "thin-skinned" boss disciplines an employee "to demonstrate that he [is] in charge." Thus, even if Heath's motives for sending Brisbois home can somehow be imputed to the Railroad employees who made the decision to suspend her, that would not prove that Bribois was disciplined because of animus toward her safety complaint.

For these reasons, Brisbois has failed to establish that her protected activity was a "contributing factor" to the Railroad's decision to suspend her. *Kuduk*, 768 F.3d at 789. The Court therefore grants the Railroad's motion for summary judgment and dismisses Brisbois's FRSA claim.

### B. *Affirmative Defense*

For the same reasons, the Railroad has demonstrated "by clear and convincing evidence" that it would have suspended Brisbois even if she had not engaged in protected activity. *Id.* Several factors (in addition to those already discussed) support this conclusion, including the "temporal proximity between the non-protected conduct and the adverse actions, the thoroughness of [the Railroad's] investigation, statements contained in relevant office policies, . . . and whether the [discipline] was approved by

others in senior management." *Gunderson v. BNSF Ry. Co.*, No. 14-CV-0223, 2015 WL 4545390, at *14 (D. Minn. July 28, 2015) (internal quotation marks and citations omitted).

Here, the Railroad held a disciplinary hearing promptly after Brisbois was accused of insubordination. Brisbois was represented by a union representative at that hearing. The Railroad took testimony from Brisbois, Heath, and several other witnesses. The Railroad had "clear written policies" against quarrelsomeness and insubordination. *Id.* And two members of "senior management"—William Scott and Justin Meyer—consulted with each other before deciding to suspend Brisbois. *Id.* Scott presided over Brisbois's disciplinary hearing, and Meyer reviewed transcripts of that hearing. Therefore, even if Brisbois could establish a prima facie case of retaliation, the Court would grant the Railroad's motion for summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [ECF No. 55] is GRANTED.

2. Plaintiff's FRSA claim relating to her five-day suspension and one-year seniority restriction is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 22, 2016                             s/Patrick J. Schiltz
                                                                Patrick J. Schiltz
                                                                United States District Judge